John F. Baxter, Respondent, v. Charles E. McDonnell, Appellant.

1. Religious Societies — Action by Priest against Bishop for Salary — Insufficient Complaint. In a complaint seeking to recover arrears of salary as a pastor, by a priest of the Holy Roman Catholic Church from the bishop of his diocese, a cause of action is not constituted by allegations that, by the rules and regulations of the church in that diocese, the bishop holds all its property, in his own name, as trustee for its benefit, and is liable, individually, upon all contracts for services rendered to the church; that each priest assigned to duty is authorized to hold the bishop, individually, liable for his salary, and that it is the duty of the bishop to provide by will for the devolution of all the trust property to the church or to his successor; that on a certain date the plaintiff was appointed pastor of a parish in the diocese by the defendant's predecessor, who had since died after devising and bequeathing all the trust property, held by him for the church, to his successor in the bishopric; that the defendant was installed as bishop and soon after received the trust property subject to the trust upon which his predecessor had held it, and upon accepting the same on his installation as bishop agreed, by virtue of the law of the church, to pay all debts incurred and to perform all contracts entered into by the late bishop in behalf of the church, in the same manner and to the same extent as if the debts had been incurred and the contracts entered into by himself.

2. Insufficient Complaint. Nor is a cause of action, in such a complaint, constituted by allegations, in a second count, of the assignment of the plaintiff priest by the defendant bishop to duty as chaplain of a hospital; that by virtue thereof the plaintiff became entitled, under the constitution and ordinances of the church, to a certain annual salary, and that the defendant is indebted to him for the balance unpaid on that basis.

3. Trust under Rules of Church — Capacity to Contract. A trust created by the rules of a church which is not shown capable of making contracts, accepting benefits or compelling performance, is not recognized by the law.

4. Judicial Notice. The courts will not take judicial notice of the civil rights and powers of the Holy Roman Catholic Church, without any averment or proof on the subject.

5. Church Trust. The same evidence is required to constitute a "church trust" and to bind a bishop as trustee thereof, as would be required in the case of a layman alleged to be a trustee, under like circumstances; and the mere receipt of property by one person, alleged to be the trustee of such a trust, under the will of another person, alleged to have been the preceding trustee thereof, forms no consideration for a

promise subsequently made by the former, as an individual, to or for the benefit of third persons.

6. RELATION OF BISHOP AND PRIEST. The relation of bishop and priest is not that of employer and employee, but is that of ecclesiastical superior and inferior ; and an alleged obligation arising from the laws of the church, and not through a personal promise, on the part of the former to become personally liable for the services rendered by the latter to the church does not constitute a cause of action in the civil courts.

7. DETERMINATION BY ECCLESIASTICAL TRIBUNAL A BAR TO ACTION BY PRIEST AGAINST BISHOP. The decision of the whole controversy, upon the submission of the parties, by the ecclesiastical tribunal organized by the church for that purpose, constitutes a bar and good defense in law to an action subsequently brought by a priest of the Holy Roman Catholic Church against the bishop of his diocese, for payment of salary as priest, on a complaint alleging no express contract, but basing the claim wholly upon church laws or customs, and asking the civil courts to examine and pass upon questions growing out of the ecclesiastical relations of the parties.

8. RELATION OF PRIEST TO ECCLESIASTICAL BODY. A priest or minister of any church by assuming that relation necessarily subjects his conduct in that capacity to the laws and customs of the ecclesiastical body from which he derives his office and in whose name he exercises his functions ; and when he submits questions concerning his rights, duties and obligations as such priest or minister to the proper church judicatory, and they have been heard and decided according to the prescribed forms, such decision is binding upon him and will be respected by the civil courts.

9. DISTINCTION BETWEEN DETERMINATION OF CIVIL RIGHTS AND ECCLESIASTICAL OBLIGATIONS. While a priest or minister can always insist that his civil or property rights as an individual or citizen shall be determined according to the law of the land, his relations, rights and obligations arising from his position as a member of some religious body may be determined according to the laws and procedure enacted by that body for such purpose.

*Baxter* v. *McDonnell,* 18 App. Div. 235, reversed.

(Argued November 22, 1897; reargument ordered November 30, 1897 [see 154 N. Y. 432]; reargued January 10, 1898; decided March 1, 1898.)

APPEAL, by certification, from an order of the Appellate Division of the Supreme Court in the second judicial department, entered June 8, 1897, affirming an interlocutory judgment sustaining a demurrer interposed by the plaintiff to the third defense set up in the answer.

The complaint contains two counts, which are preceded by certain general allegations doubtless intended to apply to both. These general allegations are, in substance, that the plaintiff, a priest of the Holy Roman Catholic Church, from September 10, 1885, until October 12, 1892, was pastor in charge of the parish of Babylon, in the diocese of Brooklyn; that, under the constitution, rules and ordinances of said church, all of the real and personal property thereof is held in the name of the bishop, individually, as trustee therefor; that by virtue of his trust it is the duty and agreement of the bishop to hold himself liable, individually, for all contracts for work, labor, services and materials furnished to the church; that the priests are appointed to posts of duty by the bishop, "and under the agreement with the bishop aforesaid made with the church as aforesaid," are authorized to hold him liable, individually, for their salaries, and they, in turn, are liable to account to him for any property or money received while performing duties under their assignments; that according to the rules it is the duty of the bishop to provide by will for the devolution of all property held by him, as such, to his successor.

After these general allegations " for a first cause of action," the plaintiff alleged that on September 10, 1885, the bishop then in charge of the diocese assigned him to the pastorate of the parish of Babylon; "that pursuant to the agreement made by and between the bishop," under the rules of the church, the plaintiff was authorized during his pastorate to receive all moneys paid by parishioners and accruing from the property of the parish, to use the same to pay the indebtedness of the parish and provide it with what was necessary, and retain for himself $1,000 per annum as well as certain perquisites, and if the income of the parish was not enough to yield him a salary at that rate " the said bishop agreed to make up the difference himself;" that the bishop died December 30, 1891, leaving a will, since admitted to probate, whereby he gave to his successor all the property that he held for the church; that the defendant was installed as such successor in May, 1892, and shortly thereafter all the property so held in trust

by his predecessor was transferred and handed over to him, and he accepted it " subject to the trusts and conditions upon which" the late bishop held the property, and upon such installation and acceptance he " did agree to pay   *   *   * all debts incurred " by his predecessor and to carry out and consummate all contracts entered into by him in behalf of the church; that between the 10th of September, 1885, and the 12th of October, 1892, the plaintiff received from many sources on account of said parish $25,741.50, and paid out on account thereof $24,173.24; that the salary earned by him during said period amounted to $7,166.66, "leaving a balance due and owing plaintiff on account of disbursements out of his said salary of $5,598.40, no part of which has been paid except the sum of $1,500;" that on the 30th of November, 1892, while in a weak condition of mind and body, he was over-awed by the influence and pressure of the defendant and his advisers and induced by false promises and coerced by fraud, covin and duress into signing a general release, under seal, discharging the defendant from any and all claims on the part of the plaintiff.

" For a second cause of action " the plaintiff alleged that on December 4, 1892, he was assigned to duty by the defendant as chaplain of St. Mary's Hospital, in Brooklyn; that, since he has been acting as such chaplain, " he has received the sum of $300 a year, making the aggregate to date about the sum of $1,100;" "that, inasmuch as this plaintiff is a pastor, he should have received the sum of $1,000 a year" or $3,666.66 in all, and that the difference of $2,566.66 is due and owing him from the defendant " as payment for salary during his   *   *   *   incumbency as chaplain of said hospital as aforesaid."

Judgment is demanded against the defendant for the sum of $6,665.08, with interest on $4,198.40 from November 12, 1892, and on $2,566.66 from August 4, 1896, besides costs.

The defendant, by the first and second defenses set forth in his answer, admitted some allegations of the complaint and denied others. The third defense is as follows: "And, for a

third separate and affirmative defense to the complaint of the plaintiff, this defendant alleges: That in an action in the Metropolitan Court of the archdiocese of New York, in which the plaintiff herein was plaintiff and this defendant was defendant, and in which all the matters of complaint alleged by the plaintiff in the complaint herein were alleged and set forth by said plaintiff in his action in said Metropolitan Court, and in which all the issues that are herein joined were therein tried, a judgment was duly rendered on or about the 25th day of August, 1895, whereby it was adjudged that: I. The decision of the court on the first complaint is that the resignation of the Rev. John F. Baxter, plaintiff, was valid. II. The decision of the court in the matter of the release and settlement is that the release signed by the plaintiff relinquishing all claims for the sum of fifteen hundred dollars ($1,500), paid to him November 30, 1892, is binding on both parties to this suit, and must stand as valid. III. The court refuses to grant plaintiff's demand for a pastor's salary for the time he has served at St. Mary's Hospital. That the said Metropolitan Court of the archdiocese of New York is a court duly organized by the Holy Roman Catholic Church, and at the time said action was therein brought and tried, and said judgment was rendered, had jurisdiction of the parties to said action and of the subject-matter of said action, and that at the times said action was commenced, and continuously thereafter until the present, said plaintiff was, has been, and now is, a member of the Holy Roman Catholic Church, and subject to the rules, laws and discipline of said church, and subject to the jurisdiction and adjudication of said Metropolitan Court."

The plaintiff demurred to the third defense upon the ground "that the said third separate and affirmative defense of said answer does not set forth facts sufficient to constitute a legal defense."

The demurrer was sustained by the courts below and the defendant now comes to this court by permission of the Appellate Division upon the following question certified for review:

"Is the third separate and affirmative defense, contained in the defendant's answer herein, insufficient in law, upon the face thereof, to constitute a defense?"

*Henry C. M. Ingraham* and *Joseph E. Owens* for appellant. If the allegations demurred to set forth a defense to either of the two causes of action alleged by the plaintiff, the demurrer should be overruled. (*Hale* v. *O. Nat. Bank*, 49 N. Y. 627; *Henderson* v. *C. A. Assn.*, 46 Hun, 504; 111 N. Y. 685; *Wheeler* v. *C. M. L. Ins. Co.*, 82 N. Y. 543; *Boyle* v. *City of Brooklyn*, 71 N. Y. 1; 6 Encyclopædia of Pleading & Practice, 301.) The allegations demurred to set forth a defense to the plaintiff's second cause of action if not to both causes of action. (*Pray* v. *Hegeman*, 98 N. Y. 351–358; *Reich* v. *Cochran*, 151 N. Y. 122; 1 Bacon on Ben. Soc. § 77.) The question as to how far the judgment of an ecclesiastical court is *per se* binding upon a civil court is not necessarily involved in this case. The admissions which flow from the plaintiff's demurrer are conclusive against the plaintiff, even though as matter of fact the defendant is in error as to the allegations constituting his third separate and affirmative defense. (*Milliken* v. *W. U. T. Co.*, 110 N. Y. 403; *A. S. Co.* v. *Bennett*, 73 Hun, 81; *Sage* v. *Culver*, 147 N. Y. 241; *Zebley* v. *F. L. & T. Co.*, 139 N. Y. 461–467; *Cornwell* v. *Clement*, 87 Hun, 50; *Marie* v. *Garrison*, 83 N. Y. 14; *Embury* v. *Conner*, 3 N. Y. 511; *Beard* v. *Mayor, etc.*, 74 N. Y. 382; *Matter of N. Y., L. & W. R. R. Co.*, 98 N. Y. 447; *Foley* v. *Royal Arcanum*, 151 N. Y. 196; *Brady* v. *Nally*, 151 N. Y. 258.) The church court having passed upon the question of church law as to the individual liability of the defendant to pay the salary of a priest adversely to the plaintiff, the allegation of fraud found in the plaintiff's first cause of action is immaterial, and such judgment, being upon a question of church law, is conclusive upon a civil court. (*Connitt* v. *R. P. D. Church*, 54 N. Y. 551; *Rector, etc.*, v. *Huntington*, 82 Hun, 125; *Walker* v. *Wainwright*, 16 Barb. 486; *Union Church* v. *Sanders*, 63 Am. Dec. 187;

*Chase* v. *Cheeney*, 58 Ill. 27; *McGuire* v. *Trustees S. P. Cathedral*, 54 Hun, 207; *Twigg* v. *Sheehan*, 101 Penn. St. 363; *Rose* v. *Vertin*, 46 Mich. 457; *Stack* v. *O'Hara*, 98 Penn. St. 213; *Moseman* v. *Hertshausen*, 69 N. W. Rep. 957.) The facts set forth in that portion of the answer demurred to constitute an arbitration and award. (Code Civ. Pro. § 500; *Wood* v. *Tunnicliff*, 74 N. Y. 44; *Howard* v. *Sexton*, 4 N. Y. 157; *McNulty* v. *Solley*, 95 N. Y. 246; *Valentine* v. *Valentine*, 2 Barb. Ch. 430; 2 Am. & Eng. Ency. of Law [2d ed.] 539; *Brazill* v. *Isham*, 12 N. Y. 15; *Sawyer* v. *McAdie*, 70 Mich. 386; *N. Y., L. & W. W. Co.* v. *Schnieder*, 119 N. Y. 475; *Vaughn* v. *Herndon*, 91 Tenn. 64.) The complaint is insufficient and should be dismissed. (*Clark* v. *Dillon*, 97 N. Y. 370; *Stanton* v. *King*, 8 Hun, 4; 69 N. Y. 609; *Austin* v. *Munro*, 47 N. Y. 360; *Ferrin* v. *Myrick*, 41 N. Y. 315; *Schmittler* v. *Simon*, 101 N. Y. 554; *New* v. *Nicoll*, 12 Hun, 431; *Blewitt* v. *Olin*, 13 N. Y. S. R. 76.) The demand in this case is only for a money judgment. In any case, when the vital question is whether the complaint is sufficient, the prayer must show the nature of the action. (*Swart* v. *Boughton*, 35 Hun, 281; *Edson* v. *Girvan*, 29 Hun, 422; *Fisher* v. *C. O. L. I. Co.*, 67 How. Pr. 191; *Alexander* v. *Katte*, 63 How. Pr. 262; *Kelly* v. *Downing*, 42 N. Y. 71.)

*L. J. Morrison* for respondent. This appeal brings up for review the question certified by the court below, and no other. (Code Civ. Pro. § 190, subd. 2; *Grannan* v. *W. R. Assn.*, 153 N. Y. 449.) No judgment of any court, not recognized by the laws of this state, constitutes a legal defense to an action brought in the courts of this state. (*Dunstan* v. *Higgins*, 138 N. Y. 76; 3 Black. Com. 23; *Glass* v. *Betsy*, 3 Dall. 8.) The respondent having demurred to one of the defenses in appellant's answer, the respondent himself is called upon to sustain the sufficiency of his pleading as if the same were assailed by demurrer on the part of the appellant. Hence, for the purpose of considering this aspect of the appeal, all the facts alleged in the complaint must be taken by the court to be

true. (*Cutler* v. *Wright*, 22 N. Y. 472; *Douglass* v. *Phœnix Ins. Co.*, 138 N. Y. 209.) Defendant's predecessor in the bishopric was personally liable to plaintiff as employer under an express contract. (*Williams* v. *Hutchinson*, 3 N. Y. 312; Wood on Master & Servant, § 67; 1 Pars. on Cont. 446; *Kent* v. *Q. S. M. Co.*, 78 N. Y. 159; *Flint* v. *Pierce*, 99 Mass. 68; *Cummings* v. *Webster*, 43 Me. 93.) The appellant in this case is liable both under the rules and regulations of the church and upon his express agreement. (*Kent* v. *Q. S. M. Co.*, 78 N. Y. 159; 1 Perry on Trusts, § 95; *Baldwin* v. *Humphrey*, 44 N. Y. 609; *Ryan* v. *Dox*, 34 N. Y. 307; *Despard* v. *Walbridge*, 15 N. Y. 374; *Wood* v. *Rabe*, 96 N. Y. 414; *Gridley* v. *Gridley*, 24 N. Y. 130; *Taylor* v. *Dodd*, 58 N. Y. 335; *Brown* v. *Knapp*, 79 N. Y. 136; *Etter* v. *Greenawalt*, 98 Penn. St. 422; *Dodge* v. *Manning*, 1 N. Y. 298.) The transfer of the property to the appellant was a good consideration for his promise to pay the debts of the deceased contracted with respect to the property transferred. (*Austin* v. *Munro*, 47 N. Y. 360; *Davis* v. *Stover*, 58 N. Y. 473; *Gifford* v. *Corrigan*, 117 N. Y. 258; *Harlan* v. *Harlan*, 20 Penn. St. 303; *Clark* v. *Gaylord*, 24 Conn. 484; *Powell* v. *Brown*, 3 Johns. 100; *Lawrence* v. *Fox*, 20 N. Y. 268; Chitty on Cont. [3d ed.] 29; *Todd* v. *Weber*, 95 N. Y. 181; *F. Nat. Bank* v. *Chalmers*, 144 N. Y. 432.) The question for this court to determine is whether, assuming all the facts alleged to be true, enough has been well stated to constitute any cause of action. (*Sage* v. *Culver*, 147 N. Y. 241; *Coster* v. *Mayor, etc.*, 43 N. Y. 399; *Wheeler* v. *C. M. L. Ins. Co.*, 82 N. Y. 543; *Boyle* v. *City of Brooklyn*, 71 N. Y. 1.) The third separate and affirmative defense is insufficient in law upon the face thereof to constitute a defense. (Const. art. 6, § 19; *People ex rel.* v. *Porter*, 90 N. Y. 68; *Dunstan* v. *Higgins*, 138 N. Y. 76; 3 Black. Com. 23; *Glass* v. *Betsy*, 3 Dall. 8; *Coffin* v. *Tracy*, 3 Caines, 129; *Dudley* v. *Mayhew*, 3 N. Y. 9; *Worcester* v. *Georgia*, 6 Pet. 515; *Matter of Ferguson*, 9 Johns. 239; *Masterson* v. *Townshend*, 123 N. Y. 458; *Bogardus* v. *N. Y. L. Ins. Co.*, 101 N. Y. 328.)

The contention that there is in any way a question of church
law involved is not borne out by the record. (*Commonwealth*
v. *Worcester*, 3 Pick. 462; *Austin* v. *Searing*, 16 N. Y. 112;
*Graham* v. *Machado*, 6 Duer, 517; *Myers* v. *Machado*, 6
Abb. Pr. 198; *Turner* v. *Roby*, 3 N. Y. 193; *McLaughlin*
v. *Nichols*, 13 Abb. Pr. 244; 2 Black. on Judg. § 523; *Watson* v. *Gaivin*, 54 Mo. 353.) The appellant is in no position
to urge the decision of the church tribunal as an arbitration
and award. (*Brazill* v. *Isham*, 12 N. Y. 9; *Denny* v. *Smith*,
18 N. Y. 567; *Lorenzo* v. *Deery*, 26 Hun, 447; *Gihon* v.
*Levy*, 2 Duer, 176.)

VANN, J. While the question certified to us for decision
involves, directly, the sufficiency of the third defense set forth
in the answer, it involves, indirectly, as we have held, the
sufficiency of the complaint also. (*Baxter* v. *McDonnell*,
154 N. Y. 432.) When reduced to their simplest form the
substantial allegations of the first cause of action purporting
to be alleged are that, by the rules and regulations of the
Holy Roman Catholic Church, in the diocese of Brooklyn,
the bishop holds all its property, in his own name, as trustee
for its benefit, and is liable, individually, upon all contracts
for services rendered or materials furnished to the church;
that each priest assigned to duty is authorized to hold the
bishop, individually, liable for his salary, and that it is the
duty of the bishop to provide by will for the devolution of
all the trust property to the church or to his successor; that
in September, 1885, the plaintiff was appointed pastor of a
parish in said diocese by Bishop Loughlin, who died in
December, 1891, after devising and bequeathing all the trust
property, held by him for the church, to his successor in the
bishopric; that in May, 1892, the defendant was installed as
bishop and soon after received the trust property subject to
the trust upon which his predecessor had held it, and upon
accepting the same on his installation as bishop agreed, by
virtue of the law of the church, to pay all debts incurred and
to perform all contracts entered into by the late bishop in

behalf of the church, in the same manner and to the same
·extent as if the debts had been incurred and the contracts
entered into by himself.   There were further allegations to
the effect that, upon this basis of liability, the defendant was
indebted to the plaintiff in a certain amount.

The second cause of action is based on the assignment of
the plaintiff to duty as chaplain of a hospital, made by the
defendant on the 4th of December, 1892, and it is claimed
that by virtue thereof he became entitled, under the constitu-
tion and ordinances of the church, to a salary of $1,000 per
annum, and that the defendant is indebted to him for the
balance unpaid on that basis.

Thus, in both counts of the complaint the liability of the
·defendant is founded upon a promise implied, as it is claimed,
from the law of the church.   In the first count two promises
are said to arise therefrom, one on the part of Bishop Lough-
lin to become personally liable for the salary of the priests,
and the other on the part of Bishop McDonnell to discharge
the obligations assumed by his predecessor in office.   The
theory of the complaint is, that while the bishop holds the
property of the church in trust for its benefit, he is personally
liable for all services rendered to it in his diocese.   No express
agreement to that effect is alleged, but simply one to be implied
from the rules and regulations of the church.   No considera-
tion is suggested, unless one springs from the relation of trust
·existing between the bishop and the church, and that relation
is dependent upon the law of the church.   Yet there is noth-
ing to show the nature of the church, except as it may be
implied from its name and the names given to certain of its
·officers.   There are no allegations as to its civil rights, power
or capacity.   We cannot tell from the complaint, which is our
sole guide, whether it is a corporation, a voluntary association,
·or a mere name, adopted by the pleader for some purpose
undisclosed.   What it is, what it can do and what can be done
to it; whether it can become the beneficiary of a trust and
·enforce its rights as such, or sue and be sued, are not made
known to us.   No valid trust is alleged, unless the church is

shown to be a body capable of making a contract and suing to enforce it. A trust created by the rules of a church which is not shown capable of making contracts, accepting benefits or compelling performance, is not recognized by the law. The pleader seems to have assumed that the court would take judicial notice of the nature and powers of the Holy Roman Catholic Church, so far as its civil rights and duties are concerned, without any averment or proof upon the subject. Judicial notice is to be taken with caution, and every reasonable doubt as to the propriety of its exercise in a given case should be resolved against it. (*Brown* v. *Piper*, 91 U. S. 37; 12 Am. & Eng. Ency. of Law, 151.) According to the general practice of the courts in all jurisdictions proof has been required upon the subject of church rights and powers, and whatever is to be proved must be alleged. Even if we should attempt to take judicial notice of the legal powers and duties of the church, it is doubtful whether the result would aid the plaintiff. Thus, Judge STRONG, in his work on " Relations of Civil Law to Church Polity," says: " A very large portion of the religious societies in the country are unincorporated, and in a few of the states charters cannot be obtained for them. They are, therefore, not legal entities, recognized as having a legal existence. They can neither sue nor be sued in civil courts. They cannot hold property directly, yet they may control property held by others for their use. Donations and grants may be legally made to trustees for the use and benefit of an unincorporated religious society or for the support of the gospel ministry in connection with any particular church." (p. 71.)

" There is still another mode in which property is largely held in this country for religious or church uses. In the Moravian congregations the property devoted to pious uses is held neither by a corporation nor by trustees, nor yet by the congregation itself. In some of the congregations, and I presume in all, the title to the churches, schoolhouses and cemeteries is held by the bishop, who transmits it by will to his successor in office. And such is the tenure of most Roman

Catholic churches in the country. The title to the real estate resides in the bishop of the diocese. In a certain sense he is a trustee thereof for religious uses, but there is no declaration of trust, and he controls the enjoyment and transmits the title by devise. The purpose of this arrangement is to exclude the laity from that power of interference which they would have were the title vested in a corporation. But, inasmuch as the holders of such titles are not corporations, either sole or aggregate, as are the English bishops, deans, and even parsons, lands held by them do not pass to their successors in office unless through the instrumentality of a deed or will." (p. 109.)

We have been referred to no statute authorizing the incorporation of the church at large. By chapter 45 of the Laws of 1863 provision was made for the incorporation of Roman Catholic churches and for the government thereof, but it is confined to a congregation, society or assemblage of persons accustomed to statedly meet for divine worship. This is now embodied in the Religious Corporations Law, which also provides for the incorporation of ecclesiastical bodies with governing authority over churches. (L. 1895, ch. 723, §§ 14, 50 and 51; L. 1876, ch. 110; L. 1886, ch. 210; L. 1882, ch. 23.)

Under the act of 1813 both real and personal property may be held in trust for the use of an unincorporated religious society without any restriction as to time, except that it shall terminate upon the lawful incorporation of the religious society, when, by virtue of the act, the title vests in the corporation. (L. 1813, ch. 60, § 4.) This also refers to congregations and not to the church at large. Indeed, in *Petty* v. *Tooker* (21 N. Y. 267, 270), it was held that the existence of the church proper as an organized body is not recognized by the municipal law. In *Van Buren* v. *Reformed Church of Gansevoort* (62 Barb. 495, 497), it was said: "In order to give an organization for public worship legal rights, and to impose on it legal obligations as a corporate body, there must be a special law declaring its existence, or there must be an incorporation under the provisions of the general law

relating to religious societies." And, in *Hardin* v. *Baptist Church* (51 Mich. 137) Judge COOLEY said : " The church is not incorporated and has nothing whatever to do with the temporalities. It does not control the property or the trustees; it can receive nobody into the society and can expel nobody from it. On the other hand, the corporation has nothing to do with the church except as it provides for the church wants. It cannot alter the church faith or covenant, it cannot receive members, it cannot expel members, it cannot prevent the church from receiving or expelling whomsoever that body shall see fit to receive or expel."

In *Silsby* v. *Barlow* (16 Gray, 329) it was said that " churches are not corporate bodies and commonly have no occasion for the exercise of corporate powers."

Kynett & Cotton, in their work on Churches and Other Religious Societies, say that " These two bodies, namely, the religious corporation and the church, although one may exist within the pale of the other, are in no. respect co-relative. The objects and interests of the one are moral and spiritual ; the other deals exclusively with things temporal and material. Each as a body is entirely independent and free from any direct control or interference by the other. * * * The church by the nature of its organization may be entirely independent of other ecclesiastical associations ; or may be a subordinate part of some general organization or denomination in which there are superior ecclesiastical tribunals, with general and ultimate power of control, more or less complete, in some superior judicature over the whole membership of the general organization."

These citations show the danger of an attempt to take judicial notice of what the civil rights of the Holy Roman Catholic Church are, and emphasize the necessity of allegations in the complaint as the basis of evidence upon the subject.

We have no statute to guide us upon the assumption that, by implication, it is part of the complaint. If, instead of the Holy Roman Catholic Church, the pleader had made use of an abstract term or a name that might be applied to various

organizations, incorporated or voluntary, the complaint would have had the same effect as a pleading that it now has. If, wherever the word " church" appears, by its full name or otherwise, a mere abstraction had been used, as, for the sake of illustration the letter " X," the complaint would then allege that by virtue of the rules and regulations of " X " the defendant assumed certain obligations and the plaintiff became entitled to certain rights, yet no one would seriously contend that such allegations constituted a cause of action. The defendant cannot be held liable on the contracts of his predecessor, unless he has expressly agreed in proper form and for a sufficient consideration to become liable thereupon. An agreement by one person to become liable for the debts of another must be an express promise in writing, and cannot arise by implication from the fact of membership in an organization having rules to that effect. The personal contracts of a bishop are the same as those of a layman, so far as their form, force and effect are concerned. This is true of his engagements as trustee. The same evidence is required to constitute a " church trust " and to bind a bishop as trustee thereof, as would be required in the case of a layman alleged to be a trustee, under like circumstances. The mere receipt of property by one person, alleged to be the trustee of such a trust, under the will of another person, alleged to have been the preceding trustee thereof, forms no consideration for a promise subsequently made by the former, as an individual, to or for the benefit of third persons. No promise in any form is alleged to have been made by the defendant to the plaintiff, but simply a general promise, made to the church, as we read the complaint, by virtue of its rules and regulations. The promise could not have been made to Bishop Loughlin, for he was not alive when it is said to have been made. A promise made to pay the personal debts of the deceased bishop out of trust funds could not be enforced, as it would be a misappropriation. If, as alleged, Bishop Loughlin was individually liable to the plaintiff for his salary, that individual liability could be enforced against his individual estate by the usual procedure

against his personal representatives. We find no trust set forth
that is capable of enforcement, but simply a moral obligation,
dependent entirely upon the integrity of the bishop. For
aught that appears, the church at large depends wholly upon
moral power to carry on its functions without appealing to the
civil authorities for aid, either through the legislature or the
courts. The complaint alleges no common-law, equitable or
statutory cause of action. If all averments relating to the
rules and regulations of the church were stricken out, nothing
of substance would remain upon which the defendant could
be held liable. No force can be given to the rules and regu-
lations as alleged, because there is no allegation as to the civil
standing, position or rights of the body that is supposed to
have made them. Even if an express promise had been made
by the deceased bishop, as an individual, to the plaintiff,
instead of a promise implied from the usages of the church,
there would have been no consideration to support an agree-
ment by the defendant, as an individual, to carry out the
promise made by his predecessor. The receipt of trust prop-
erty by him, as trustee, constitutes no consideration for an
individual promise. In other words, the defendant cannot be
held liable as trustee of the church to use trust funds to pay
the individual debts of Bishop Loughlin, for that would be an
unlawful use of trust funds, and he cannot be held liable, as
an individual, to pay those debts for the want of a sufficient
consideration and an express promise in proper form.

The claim of the respondent, that the bishop, individually,
is the employer of the plaintiff and liable as such for his com-
pensation, is not sustained by the complaint. The legal rela-
tion of master and servant is not alleged, either expressly or
impliedly, for, according to the complaint, the bishop, as such,
holds the property of the church in trust, and has the power
to assign priests to duty, but is liable as an individual and not
as trustee, for the services of the priests upon such assignments,
by virtue of the laws of the church and not through his per-
sonal promise. Obviously this relation is in no sense that of
master and servant, but that of an ecclesiastical superior and

inferior, with an alleged obligation arising from the laws of the church on the part of the former to become personally liable for the services rendered by the latter to the church. The relation of priest and congregation is not involved, but that of priest and bishop.

This subject was considered in *Twigg* v. *Sheehan* (101 Pa. St. 363), where a priest sued his bishop for salary, and the canon law bearing on the organization of the church and the relation of the priesthood and the bishops was before the court. The trial court found that the plaintiff was entitled to a salary of $800 per year under the common law of the church, which guaranteed him a support when he was ordained as priest. The Supreme Court, however, held that while the organic law of the Roman Catholic church was to the effect that the church was bound to provide a decent support for its priests, this did not constitute an implied contract on the part of the bishop of the diocese to support the priests therein; that no priest, in the absence of an express contract, could bring assumpsit against his bishop for an amount sufficient to decently support him, and that the relation between a Roman Catholic bishop and priest is not that of hirer and hired, or principal and agent. In deciding the case the court said : " The plaintiff alleges that the law of his church creates a duty from which springs an implied contract on the part of the bishop to support him so long as he remained a priest of the diocese, and was not convicted of any offense or suspended from his priestly functions. Is this position sound ? The obvious test is to reverse the position and treat this as a suit by the bishop to recover damages from the plaintiff for a failure to perform his priestly functions, or any duty prescribed by his ordination vows. No one will contend that such a suit could be maintained. The plaintiff can lay down his office and its duties at pleasure. For doing so he could only be visited with ecclesiastical censure, and such punishment, if any, as the canons of the church prescribe. The bishop would have no remedy in the courts of law. It will thus be seen that there is no mutuality. * * * It would be doing a wrong to the Catholic church and degrade

its priesthood from their high position were we to hold that the relation between the bishop and his priest was that of hirer or hired, of employer and employee. The moving consideration in such contracts is the pecuniary advantages flowing from the relation. When a priest dedicates his life to the church and takes upon himself the vows of obedience to its laws, he is presumed to be actuated by a higher principle than the hope of gain. Where he has an actual contract with his congregation or his bishop for a salary, it may be enforced as any other contract; but where he relies upon the duty of his church to support him, he must invoke the aid of the church if he seeks redress."

In *Rose* v. *Vertin* (46 Mich. 457) it was held that a bishop is not liable for the salary of a priest whom he has engaged, and that they are fellow-servants of the church for which the bishop acts merely as a superior agent and not as a principal. The learned justices united in saying that " the bishop was the priest's superior, and according to the established order of things in the economy of the church government, regulating the degrees of subordination and the methods of administration, it was the province of the bishop to designate the place for the priest to exercise his functions, and prescribe under certain limitations the rules and precepts for his guidance and control. But both were common servants of the church and the service of the priest was not a service for the bishop, nor was the bishop, in respect to the employment, a principal. *   *   *    Men are constantly going into positions under appointment by superior agents, and where no liability for compensation rests on the employing agent, and the means of payment, if they come at all, are to come from another source. Cases of illustration are infinite. They abound in business operations, and marked instances may be seen in the great missionary enterprises which are carried on. No one supposes the existence of a legal liability on the part of the appointing agency."

In *Methodist Church of Newark* v. *Clark* (41 Mich. 730, 737) it was declared that " where there is no incorporation, those

who deal with the church must trust for the performance of civil obligations to the honor and good faith of the members." (See, also, Hoffman's Ecclesiastical Law, 141, 145; Andrews' Church Law, 4, 57; Humphrey's Law of the Church, 2, 62.)

Without prolonging the discussion, we announce as our conclusion that the complaint does not set forth a cause of action, and that for this reason the third defense pleaded in the answer is sufficient, for when the complaint is defective the answer is not demurrable. (*Baxter* v. *McDonnell*, 154 N. Y. 432, 436.) It is, therefore, our duty to reverse the judgments of the courts below and to overrule the demurrer to the third defense set up in the answer, with costs, and under the circumstances to answer the question certified, as to the insufficiency of said defense, in the negative.

HAIGHT, J. I think that the question submitted to us, namely, whether the third defense interposed by the defendant is good in law upon its face to constitute a defense, should be directly decided. It is true that where there is a defect in the plaintiff's complaint, he is not in a position to assail the sufficiency of his opponent's answer. But the defendant may waive defects in the complaint by omitting to call attention to them, or in not having questions with reference thereto certified to this court to be answered. (Code C. P. § 190, subd. 2.)

The plaintiff does not count upon any express agreement or contract, but upon a claim founded wholly upon church laws or customs. The defense is that the plaintiff himself, prior to the commencement of this action, brought suit against the defendant for the same cause in the Metropolitan Court of the diocese, that being an ecclesiastical court possessing jurisdiction as such over the parties and the subject-matter of the controversy; that the cause was duly heard in that court and decided. The precise question is, whether such a defense to such a cause of action or claim is good in law. Judge BRADLEY, in the court below, conceded that the plaintiff was bound by the determination of that tribunal so far as related to the

matter of discipline and ecclesiastical rules, laws and customs
of church government; and when rights of property are
dependent upon the questions of doctrine, discipline or church
government, the civil court will treat the determination made
in the highest tribunal within the church as controlling.
(*Watson* v. *Jones*, 13 Wall. 679; *Connitt* v. *R. P. D.
Church of New Prospect*, 54 N. Y. 551.)

But he was of the opinion that that tribunal did not have
jurisdiction to determine other civil and temporal rights. We
need not question this rule. As we have seen, the plaintiff
has alleged no express contract. He claims under some cus-
tom or law of the church that he should be paid a salary, as a
priest, of a thousand dollars per year, by the bishop. Here
the plaintiff asks the civil courts to examine and pass upon
questions growing out of his relations to the church and the
bishop, as one of the priests of the diocese.

In such a case, when it appears that the whole controversy
had once been submitted by the parties to the ecclesiastical
tribunal which the church itself has organized for that pur-
pose, the civil courts are justified in refusing to proceed any
further. The decision of the church judicatory may and should
then be treated as a bar to the action and a good defense in law.

When an individual joins an incorporated club or legally
organized body with power to make laws and rules for its own
government, and for the regulation of the conduct of its
members, the member becomes bound by those laws and rules,
and a decision by the body or a duly constituted committee
proceeding according to judicial forms touching his rights or
relations as a member, is binding upon the courts.

A priest or minister of any church by assuming that relation
necessarily subjects his conduct in that capacity to the laws and
customs of the ecclesiastical body from which he derives his
office and in whose name he exercises his functions, and when
he submits questions concerning his rights, duties and obliga-
tions as such priest or minister to the proper church judica-
tory, and they have been heard and decided according to the
prescribed forms, such decision is binding upon him and will

be respected by the civil courts. The decisions of the courts in this country are substantially in accordance with this view. (*In re Haebler* v. *N. Y. Produce Exchange*, 149 N. Y. 414; *People ex rel. Johnson* v. *N. Y. Produce Exchange*, 149 N. Y. 401; *O'Hara* v. *Stack*, 90 Penn. St. 477; *Stack* v. *O'Hara*, 98 Penn. St. 213; *Twigg* v. *Sheehan*, 101 Penn. St. 363; *Kerr's Appeal*, 89 Penn. St. 97; *Rose* v. *Vertin*, 46 Mich. 457; *Chase* v. *Cheney*, 58 Ill. 509; *People ex rel. Meads* v. *McDonough*, 8 App. Div. 591.)

He can always insist, of course, that his civil or property rights as an individual or citizen shall be determined according to the law of the land, but his relations, rights and obligations arising from his position as a member of some religious body may be determined according to the laws and procedure enacted by that body for such purpose.

The question should be answered in the negative and the judgment reversed, and the demurrer overruled, with costs.

VANN and HAIGHT, JJ., read for reversal of judgment and overruling of demurrer to the third defense, with costs, and for answering in the negative the question certified; PARKER, Ch. J., O'BRIEN and BARTLETT, JJ., concur with both opinions; MARTIN, J., concurs with VANN, J.; GRAY, J., absent.

Judgment reversed, etc.